UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
LEE ANN RIEDEL,

              Petitioner,

              OPINION &ORDER
              CV-08-3593 (SJF)

    -against-

ADA PEREZ, Superintendent,
Bedford Hills Correctional Facility,

              Respondent,

--------------------------------------------------X

FEUERSTEIN, J.

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   AUG 1 5 2012   ★

LONG ISLAND OFFICE

On April 28, 2004, a judgment of conviction was entered against petitioner Lee Ann

Riedel ("petitioner") in the County Court of the State of New York, County of Suffolk (Ohlig,

J.), upon a jury verdict finding her guilty of one (1) count of murder in the first degree, one (1)

count of murder in the second degree, and conspiracy in the second degree, and imposition of

sentence. On September 3, 2008, petitioner filed a petition in this court seeking a writ of habeas

corpus pursuant to 28 U.S.C. §2254. For the reasons set for herein, the petition is denied in its

entirety.

I.     Background

     A.     Factual Background.

In July 1999, petitioner married Paul Riedel ("Paul") and they subsequently had one (1)

son together. (Paul: T1. 545-46; T2. 23)[1]. Petitioner also had a son from a prior relationship who initially lived with them. (Paul: T1. 546).

On direct examination Paul testified that, at all relevant times: (a) he had an ownership interest in the home in Babylon in which he and petitioner lived (although on cross-examination he stated that the deed to the home was in petitioner's father's name, his name had never been on the deed, the mortgage and taxes on the home were paid through petitioner's father and the deed was eventually transferred into petitioner's name without his knowledge, [T1. 546-47, T2. 24-5, 28-9, 98, 183-84]); (b) he had a fifty percent (50%) ownership interest in the Dolphin Fitness Club in Amityville ("the gym") and Alex Algeri ("Algeri") was one (1) of his partners in that business, (T1. 543-44, T2. 25, 32-3, 183-84, 202); (c) he owned a tanning salon, (T1. 547, T2. 49, 183-84); and (d) he kept one hundred forty thousand dollars ($140,000.00) in cash at petitioner's grandmother's house and one hundred forty thousand dollars ($140,000.00) in cash in a safe deposit box to which petitioner initially had access, (T1. 547-49, T2. 33-46).

On June 28, 2000, petitioner left Paul, took the money that he had kept at her grandmother's house and moved with her sons to Florida to live with her mother Pat Armanini ("Armanini") and her mother's friend, Elizabeth Russo ("Russo"). (Russo: T1. 275, 277-79, 316-17, 358, 361; Paul: T1. 550-51, T2. 180). Thereafter, Paul called petitioner to ask her to return his money and son, but petitioner refused. (Russo: T1. 279-80, 353-54; Paul: T1. 551-52; T2. 67, 70). Petitioner, Armanini and Russo subsequently discussed trying to find someone to keep Paul away from petitioner. (Russo: T1. 280, 282-85, 302, 307-08; Pollack: T2. 240-41;

---

[1] "T1" refers to the transcripts of the trial proceedings from February 17, 2004 through February 20, 2004. "T2" refers to the transcripts of the trial proceedings from February 23, 2004 through March 26, 2004.

Mike Paglianti ["Paglianti"]: T2. 345-47). Russo told Larry Diodato ("Diodato"), an acquaintance of hers, that her "niece" wanted someone to beat up her husband, who owned a gym and a house and had money. (Russo: T1. 281, 342, 350, 359-60; Diodato: T1. 394-395, 399, 411, 435-36, 474, 477-78). Diodato then told Ralph Salierno ("Salierno") that Russo's "niece" wanted someone to beat up her husband, (Diodato: T1: 396-97, 499; Paglianti: T2. 345), and put Russo in contact with Salierno. (Russo: T1. 281-84, 335-36; Diodato: T1. 394-97, 459, 478).

Richard Pollack ("Pollack"), a friend of Salierno's, testified that he arranged a meeting with Armanini on Salierno's behalf. (Pollack: T2. 237-38, 249-50, 255, 283). At a meeting at Armanini's house between petitioner, Russo, Armanini, Salierno and Pollack in the summer of 2000, the idea of scaring Paul, or beating him up, was discussed, (Russo: T1. 283-86, 305, 309-11, 340-41; Pollack: T2. 237-44, 255-56, 262-63, 289-90), and petitioner stated that she had access to money in a safe deposit box, (Pollack: T2. 241, 256). During the meeting, it was suggested that drugs be planted on Paul or that he be beaten up, and petitioner said that she wanted Paul beaten, but not badly hurt. (Russo: T1. 284-85; Pollack: T2. 240-42). Before leaving the meeting, Salierno and Pollack told the others that they would let them know if they could help. (Russo: T1. 288; Pollack: T2. 241-43).

Detective Edward Fandrey ("Fandrey") testified that petitioner initially denied ever seeking Salierno's assistance with respect to Paul, but ultimately admitted to Fandrey that she first met Salierno in July 2000 when Russo arranged a meeting with him and Pollack at Armanini's house because she was looking for someone to beat up Paul. (T2. 2181-82, 2193-94, 2196). Petitioner provided and signed a written statement to Fandrey indicating that she and Paul began having marital difficulties before the summer of 2000; that Russo had introduced her to

3

Salierno in the summer of 2000; that she had met with Salierno and Pollack at Armanini's house; that during the meeting, Russo had said that somebody "should kick [Paul's] fucking ass, break his legs;" that Pollack had responded "[he and Salierno] can do that. We can whack him if you want;" that petitioner had replied that she did not want Paul killed, or anything to happen to him; and that Salierno was the father of her third son. (T2. 2204-07, 2210-19). Telephone records indicate calls between Salierno and petitioner beginning on July 28, 2000. (Detective Anderson ["Anderson"]: T2. 2031).

Salierno agreed to assist petitioner after Diodato told him that petitioner, Russo and Armanini could pay him and that Paul was not protected by the mob. (Diodato: T1. 397-400; Pollack: T2. 243-45, 254-55, 284-87; Paglianti: T2. 252-55).

On August 25, 2000, Paul commenced a divorce proceeding against petitioner, (Russo: T1. 292; Paul: T1. 558-59), which he discontinued in December 2000 at petitioner's request. (Paul: T1. 563-64). In the fall of 2000, petitioner reconciled with Paul, moved back to New York with their son to live with him in the house in Babylon and returned a portion of the money that she had taken from him. (Paul: T1. 562-65, T2. 162-63; Russo: T1. 292, 361-62; Fandrey: T2. 2172). However, petitioner continued traveling to Florida to visit Salierno and her eldest son, who had remained in Florida. (Russo: T1. 292-94; Paul: T1. 574, T2. 161-62).

Scott Paget ("Paget"), a friend of Salierno's, (T2. 1159), testified that in January 2001, Salierno told him that petitioner wanted Paul killed; that he would profit from killing Paul; and that petitioner had given him directions to the gym, told him that Paul drove a black Yukon and provided him with a description and photograph of Paul. (T2. 1165-66, 1178-81).

4

Michael Paglianti ("Paglianti"), another friend of Salierno's, testified that in the beginning of December 2000, Salierno asked him to help him obtain a gun and to rent him a van using Paglianti's credit card, and offered him three thousand dollars ($3,000.00) to drive him to New York so that Salierno could kill Paul, but Paglianti refused. (T2. 363-64). Salierno then offered to pay Paget three thousand dollars ($3,000.00) to drive him from Florida to New York and back, (Paglianti: T2. 367-68, Paget: T2. 1165-66, 1206-07, 1288-90), and obtained a gun himself. (Paget: T2. 1167; Paglianti: T2. 364, 560).

Diodato testified that in or about December 2000 or January 2001, Salierno asked him to rent him a car because he did not have a credit card, but Diodato could not help him because he also did not have a credit card. (T1. 402, 405, 440, 493-94). Salierno then asked Diodato if one of Diodato's employees could help him to rent a car, so Diodato provided him with the names of two (2) of his employees, Jimmy Dazzler and Lucas Shuck ("Shuck"). (T1. 402-03, 405, 440). Shuck subsequently used his own credit card to rent a white minivan for Salierno. (Diodato: T1. 402-06, 494; Shuck: T1. 508-13; Paglianti: T2. 364, Paget: T2. 1170-71).

Paget testified that he and Salierno left in the minivan for New York during the evening of January 16, 2001, (T2. 1171-72, 1206, 1302), and that Salierno had called him several times that day before they left. (T2. 1171). Telephone records corroborate that Salierno called Paget four (4) times on January 16, 2001. (Anderson: T2. 2034). According to Paget, he and Salierno arrived in New York in the late afternoon or early evening the following day, January 17, 2001. (T2. 1173).

On January 17, 2001, at approximately 7:25 p.m., Salierno fatally shot Algeri in the back parking lot of the gym, believing that Algeri was Paul. (Police Officer Eric Onderdonk: T1. 94,

103-04, 133; Christine Baecker ["Baecker"]: T1. 184-86; Melissa Easterbrook ["Easterbrook"] T1. 212-13; Paget T2. 1179, 1182). Paget testified that before shooting Algeri, Salierno had called out Paul's name. (T2. 1182, 1329). Following the shooting, Salierno disposed of the gun and the clothing that he had been wearing in a nearby body of water and Paget drove them back to Florida. (Paget: T2. 1184, 1198-99, 1206). Paget testified that Salierno paid him three thousand dollars ($3,000.00) upon their return to Florida. (T2. 1206-07).

At the time of Algeri's murder, both Paul and Algeri worked at the gym, drove black GMC Yukon SUVs with a white Dolphin Fitness Club emblem placed somewhere on the back of each vehicle, parked their vehicles at the back door of the gym and were similar in appearance. (Paul: T1. 544-45, 567-69; Easterbrook: T1. 204-06, 210). Not many other vehicles parked in the back of the gym because the lighting was dim. (Paul: T1. 567-68; Baecker: T1. 175; Easterbrook: T1. 212-13). Paul testified that petitioner knew where he usually parked his car at the gym, (T1. 575-76), and that when he had left his home to go to work on the day of Algeri's murder: (1) petitioner had been home; (2) he had told petitioner that he was going to work; and (3) petitioner had known that he was driving his Yukon to work. (T1. 575-76, T2. 175-76).

A gun was eventually recovered from a creek along Montauk Highway in the Amityville-Copiague area, (Sergeant Raymond Epp: T2. 1453, 1456-58, 1469-70; Detective Victoria Lehane: T2. 1504), near the area where, according to Paget, Salierno had thrown the gun he had used to shoot Algeri. (Anderson: T2. 1974-75, 2029-30). The gun recovered from the creek was later determined to be a Smith and Wesson Model 60, five (5)-shot double action revolver chambered for the .38 special cartridge and containing five (5) expended Winchester brand .38 special cartridge casings. (George Krivosta ["Krivosta"], T2. 1708, 1713, 1716-18, 1746;

6

Anderson: T2. 2029). The five (5) expended bullets recovered from the murder scene were all "copper washed lead bullets of the .38 caliber class * * * consistent with Winchester brand .38 special cartridges * * * [also known as] .38 Smith and Wesson special." (Krivosta: T2. 1702-04, 1707, 1718-19, 1750).

Paglianti testified that Salierno had told him that petitioner had told him about money in a safe deposit box and real estate that he would receive for "taking care of" Paul and giving him "a major beating," (T2. 346-47, 349, 351-55, 541-47, 560-62), had discussed planting drugs upon Paul and setting him up to get arrested, (T2. 349-50, 548-49), and had changed the plan into wanting Paul killed instead of just beaten, (T2. 351, 355-56). Paglianti further testified that he had been present when petitioner: (a) told Salierno that she wanted Paul killed, (T2. 358-60); (b) discussed what Salierno would receive once Paul was killed, (T2. 359-60); and (c) gave Salierno a photograph of Paul and driving directions to three (3) places in New York where Paul could be found, (T2. 360-62, 562-63). Paglianti also testified that Salierno told him that he paid Paget three thousand dollars ($3,000.00) to drive him in a minivan to New York, where Salierno would "take care of" Paul, and then back to Florida. (T2. 365). In addition, Paglianti testified: (a) that Salierno had not been at the gym in Florida for his usual workouts during the time of Algeri's murder, (T2. 365-66); (b) that on his way back to Florida after the murder, Salierno had called Paglianti, stated that everything had gone well and ridiculed Paget for being nervous, (T2. 366-67); and (c) that during a conversation with Salierno the next day, Salierno told him (i) that Paget had parked the minivan near the rear entrance to the gym; (ii) that Salierno had gotten out of the minivan, shouted "Hey, Paul" to a man who had exited the rear entrance of the gym and was getting something out of the glove compartment of a vehicle, and then shot the man three (3) to

five (5) times in the head, neck and chest area, (iii) that Salierno had then gotten back into the minivan and Paget drove away and (iv) that he had thrown the gun used to shoot Algeri into a body of water close to the gym, (T2. 367-69, 558). Telephone records corroborate that Salierno called Paglianti the day after the murder. (T2. 2034-35).

Following his conversation with Salierno regarding Algeri's murder, Paglianti and Salierno went to the house of Frank Paglianti ("Frank"), Paglianti's father, where they learned that it was Algeri, not Paul, who had been killed. (Paglianti: T2. 370-371, 555-56, 566-68, 827-28; Frank: T2. 985-86, 990, 1006-07). According to Paglianti, Salierno told him that he had shot the wrong man because Algeri had driven the same vehicle as, and was similar in appearance to, Paul. (T2. 371). Paget testified that on January 19, 2001, while he was at Paglianti's office with Paglianti, Salierno and Frank, Salierno showed him a news article from the internet and said: "I got the wrong guy." (T2. 1216, 1298-1300). Paglianti also testified that he had been present during a subsequent discussion between Salierno and petitioner in February or March of 2001, during which petitioner called Salierno a "stupid bastard" for shooting the wrong person and Salierno responded that petitioner should have given him a better description or photograph of Paul. (T2. 372-74).

Paul testified that petitioner had called him on the night of the murder to tell him that Algeri had been killed and that he had responded that the shooter must have been looking for him, not Algeri. (T1. 578-79, 656-58; T2. 136, 138-39, 150-51, 164-65). According to Paul, petitioner told him that she also thought Algeri's murder had been intended for him and begged him to move to Florida. (T2. 150-51).

Petitioner moved with their son back to Florida after Algeri's murder and eventually

procured a place in Hypoluxo, Florida for her, Paul and their son to live in. (T1. 581-83; T2. 151). Paul joined them in or about February 2001, although he frequently traveled to New York to run his business. (T1. 581-584, T2. 152). Telephone records indicate that there were calls between Salierno and (1) the telephone number of Armanini's house at or about the time of the murder and (2) the home in which petitioner lived in Hypoluxo, Florida in early February 2001. (T2. 2035-37).

After moving to Florida, Paul began working out at a gym there, where he was recognized by Paget. (T2. 1217-18, 1340-41). Thereafter, Paget monitored Paul's activity at Salierno's request and Salierno asked Paget whether he thought it was possible that they could kill Paul at the gym in Florida, but Paget responded that it was "not a good idea." (T2. 1218-19).

Paget and Michael Zeltzer ("Zeltzer") testified that after the murder of Algeri, they overheard Salierno say to a man in a nightclub with whom he was arguing: "I kill people... .[If] I get the right guy" ("Salierno's bar statement"). (Paget: T2. 1220; Zeltzer: T2. 1431, 1444).

In April 2001, petitioner told Paul that she was pregnant and in September 2001, Paul questioned petitioner about whether he was the father of her unborn child. (T1 584-86; T2. 153-54). In October 2001, petitioner filed for divorce from Paul in Florida and Paul subsequently learned, after petitioner's child was born, that Salierno was the child's father. (T1. 586-87, 661, T2. 147).

B.    Procedural History

On April 28, 2004, a judgment of conviction was entered against petitioner in the County Court of the State of New York, County of Suffolk (Ohlig, J.) ("the trial court"), upon a jury

verdict finding her guilty of one (1) count of murder in the first degree (N.Y.C.P.L. §125.27 [1] [a] [vi]), one (1) count of murder in the second degree (N.Y.C.P.L. §125.25 [1]), and one (1) count of conspiracy in the second degree (N.Y.C. P.L. §105.15), and imposition of sentence to concurrent indeterminate terms of imprisonment of twenty-five (25) years to life for each murder conviction and eight and one-third (8 1/3) to twenty-five (25) years for the conspiracy conviction.

Petitioner appealed her judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("the Appellate Division") on the grounds, *inter alia*: (1) that the prosecution failed to establish her guilt beyond a reasonable doubt; (2) that the trial court erred (a) in allowing into evidence hearsay statements that had not been made in furtherance of the conspiracy and inflammatory photographs, (b) in not declaring a mistrial when the prosecutor elicited irrelevant and bolstering testimony and (c) in permitting the prosecutor to attack defense counsel in her summation; (3) that the erroneous admission into evidence of statements made by Salierno violated her constitutional rights to confront the witnesses against her and to a fair trial; and (4) that the prosecutor elicited evidence that violated her Sixth Amendment right to counsel.

By order dated March 13, 2007, the Appellate Division affirmed petitioner's judgment of conviction, finding: (1) that the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt; (2) that petitioner's contention that the trial court erred in admitting the testimony of Paget regarding certain hearsay statements was unpreserved; (3) that any error in the trial court's admission into evidence of co-conspirator statements through Paget or Zeltzer was harmless "since the other evidence against [petitioner] was overwhelming and there was no

significant probability the jury would have acquitted [petitioner] had the statements been excluded"; and (4) that petitioner's remaining contentions were without merit. People v. Riedel, 38 A.D.3d 689, 689, 832 N.Y.S.2d 247, 247 (2007). On July 12, 2007 the Court of Appeals of the State of New York denied petitioner's application for leave to appeal to that court from the March 13, 2007 order of the Appellate Division. People v. Riedel, 9 N.Y.3d 868, 840 N.Y.S.2d 898, 872 N.E.2d 1204 (2007).

## II. Discussion

### A. Procedural Issues

Petitioner seeks a writ of habeas corpus on the following grounds: (1) that the trial court erred in admitting the hearsay statements of her co-conspirators into evidence because (a) the government did not establish a prima facie case of conspiracy and (b) Salierno's statements to Paget, Zeltzer and Paglianti do not fall within the co-conspirator exception to the hearsay rule because they were not made "in furtherance" of any conspiracy; and (2) that the erroneous admission of those hearsay statements violated her rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

Respondent contends, inter alia, that petitioner (1) did not exhaust her claim that the trial court erroneously admitted the hearsay statements of her co-conspirators absent a prima facie showing of a conspiracy because she failed to assert that same legal theory in the state courts; and (2) did not exhaust her claim based upon the testimony of Paget, Zeltzer and Paglianti regarding Salierno's statements to them because she rests that claim upon factual allegations not presented to the state courts.

11

## 1. Exhaustion

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. §2254(b)(1)(A); see also Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011), cert. denied, 132 S. Ct. 265, 181 L. Ed. 2d 155 (2011) ("[B]efore a federal court can consider a habeas application brought by a state prisoner, the habeas applicant must exhaust all of his state remedies."). "Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Cornell v. Kirkpatrick, 665 F.3d 369, 375 (2d Cir. 2011) (quoting Carvajal, 633 F.3d at 104). Exhaustion requires a petitioner to "'fairly present' the federal claim 'in each appropriate state court (including a state supreme court with powers of discretionary review),'" Richardson v. Superintendent of Mid–Orange Corr. Facility, 621 F.3d 196, 201 (2d Cir. 2010), cert. denied, 131 S. Ct. 1019, 178 L. Ed. 2d 844 (2011) (quoting Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004)), i.e., the "petitioner must 'present[ ] his [or her] claim to the highest court of the state.' " Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (quoting Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000)). "In developing and refining the 'fairly present[ed]' standard, the Supreme Court has concentrated on the degree of similarity between the claims that a petitioner presented to the state and federal courts." Smith v. Duncan, 411 F.3d 340, 349 (2d Cir. 2005) (alteration in original, citation omitted).

a.    Legal Theory

Contrary to respondent's contention, petitioner exhausted her claim regarding the

admission of hearsay statements of her co-conspirators absent a prima facie showing of

conspiracy because she presented "all of the essential factual allegations...and essentially the

same legal doctrine" in her federal petition as she asserted in the state courts.  McKinney v.

Artuz, 326 F.3d 87, 96-7 (2d Cir. 2003) (quotations omitted); see also Waterhouse v. Rodriguez,

848 F.2d 375, 381 (2d Cir. 1988)(holding that exhaustion requires, "the legal doctrines asserted

in the state and federal courts [to] be substantially the same...The legal theory relied upon in the

federal court need not, however, be identical to the legal theory presented to the state courts,

provided that the essential factual allegations and the ultimate constitutional question raised in

the federal petition were presented to the state courts." (quotations and citation omitted)).

Specifically, petitioner has maintained substantially the same legal argument that she was denied

the right to a fair trial by the erroneous admission of hearsay statements at trial under the co-

conspirator exception to the hearsay rule absent a showing of a prima facie case of conspiracy.

Although not an enumerated point, petitioner contended on direct appeal:

> "With respect to the statements allegedly made by [petitioner], those statements
> could only be received against her if they were in furtherance of the conspiracy
> *and only if a conspiracy had been established, which it had not.*  'Once the
> evidence establishes a prima facie case of conspiracy, the admissions of each
> conspirator made or done in the course of and furtherance of the conspiracy are
> admissible against the others, both as evidence establishing the conspiracy count
> and guilt of the substantive crime.'"

(Brief of Petitioner-Appellant ["Brief of Pet-App"] at 12) (emphasis added).

In her application for Leave to Appeal to the New York Court of Appeals, petitioner

argued:

13

"*Before evidence could be considered for admissibility under the [co-conspirator exception to the hearsay] rule, a predicate determination must be made that the conspiracy exists.* In advance of Paget's testimony, the trial court invited defense counsel to make applications with regard to the admissibility of statements... During this lengthy argument, defense counsel addressed a number of substantive and pervasive issues...[and] argued that *there was no showing of a conspiracy* to commit murder."

(Letter for Leave to Appeal of Petitioner-Appellant ["Lv. Applic."] at 4) (emphasis added).

A footnote to that quote stated: "The [trial] court had earlier ruled, during the testimony of witness Paglianti, that the People had made a prima facie showing of a conspiracy." (Id. at 4).

In her petition to this court, petitioner contends:

"After the direct examination of the witness [Diodato], [petitioner's] counsel moved for a mistrial, predicated upon the first of the significant evidentiary violations which lie at the heart of this petition. Counsel stated: '[the prosecutor] cannot elicit what she thinks are statements in the furtherance of a conspiracy by a co-defendant until she proves the existence of a conspiracy by clear and convincing evidence. The statement—that's the rule. We can all look it up in cases. That's the rule. She doesn't get to introduce the statements first and prove the conspiracy second. There's been no conspiracy established here at all concerning some agreements between Mr. Salierno and anyone to beat up anybody for any purpose. So when she allowed the statement to come in that said, "I'll take the job," what that was, presumably she'll argue, is Mr. Salierno saying that he agreed to do a beating for [petitioner]. That's the only implication of it. And that statement, "I'll take the job,"...will be used to argue that [petitioner] in some way had [sic] there was a conspiracy entered into. There was an agreement entered into. There was a job to be taken. The statement was made by a nontestifying co-defendant or alleged conspirator. It was made at a time before the existence of the conspiracy has been established. The testimony from [] Russo is there was no such agreement for money. There was nothing that was going to happen until Paul [] came down. So his statement, "I'll take the job," can't come in now. She can't argue that that proves the conspiracy. The rule is you have to prove the conspiracy absent the statements. I objected to it. It's absolutely improper. And I need—I want a mistrial.'"

(Pet. at 8).

Thus, the claim that a prima facie case of conspiracy had not been established for purposes of the co-conspirator exception to the hearsay rule was asserted in both the state courts

and this Court. <u>See</u> 28 U.S.C. §2254(b)(1). In any event, as set forth below, the claim is denied on the merits. <u>See</u> 28 U.S.C. §2254(b)(2).

b.    Factual Allegations

Petitioner also sufficiently exhausted her claim challenging the trial court's admission of certain testimony of Paget and Paglianti regarding statements made to them by Salierno. Specifically, prior to the testimony of Paget and Paglianti at trial, defense counsel moved to preclude testimony regarding various statements expected to be attributed to Salierno at trial, (T2. 325), arguing:

> "There's three categories of statements that he gives, Paglianti, admissions—alleged admissions by [petitioner], alleged admissions by [] Salierno, statements by [] Salierno, which are arguably made in the furtherance of a conspiracy to murder. The only admissible testimony against [petitioner] would be alleged admissions by her and alleged admissions by Salierno made in the furtherance of the conspiracy of it…If what the prosecutor says is true, which is a conspiracy [that] never ended, is her theory, it still exists today?…I mean, there's no other planning, no other discussions, nothing else."

(T2. 325-328).

The trial court denied defense counsel's request "to spell out statement by statement and spell out for the Court exactly what statements I think are simply admissions by Salierno to Paglianti," as opposed to statements made in furtherance of the conspiracy, (T2. 331), and directed him to make objections at the appropriate time. (T2. 334). However, when, during Paglianti's testimony, defense counsel stated: "I don't know how else to do it other than to say 'objection' every time [the prosecutor] asks: What did [Salierno] say?", (T2. 348), the trial court responded that defense counsel could have "a continuing objection." (T2. 348).

In Point II of her appellate brief, petitioner contended, inter alia: (1)(a) that some of the statements allegedly made by Salierno "consisted of co-defendant admissions and should have been received against Salierno only and not against [petitioner]," (Brief of Pet-App at 13), and (b) cited as an example the statement: "Salierno told Paglianti that he would get the job done for a sum of money," (Id.); (2)(a) that the statements allegedly made by petitioner were not in furtherance of the conspiracy, (Id. at 12-13), and thus, could not be received against her and (b) cited as an example the statement: "on one occasion [petitioner] said that she wanted him [Paul] dead," (Id.); and (3) that "any alleged statement [by Paget] about killing the wrong person was NOT even in furtherance of any conspiracy," (Id. at 14).

In her application for Leave to Appeal to the New York Court of Appeals, petitioner argued:

> "In advance of Paget's testimony, the trial court invited defense counsel to make applications with regard to the admissibility of statements…He contended: 'Not everything that Salierno says during the time the conspiracy is operative is a statement in furtherance of the conspiracy. It has to be made in furtherance of it. Just because he utters words and makes factual claims and there's a conspiracy doesn't mean that the two go together.'"

(Lv. Applic. at 4). Petitioner also argued:

> "Defense counsel moved for a mistrial at the conclusion of Paglianti's testimony, stating, '…I don't know how else to make a record of this other than all those statements- and we now have them on record- where Salierno just breaking [sic] or telling Paglianti what he's doing aren't admissible against [petitioner]. It's not just—you completely—the Court has completely ignored the distinction between admissions by a co-conspirator and statements in furtherance of the conspiracy by a co-conspirator. You simply—it's as if that distinction does not exist in this courtroom. I don't know how else to put it. I can go through the statements. I know the Appellate Division is difficult when it comes to preservation of error.'"

(Id. at 6).

In her petition to this Court, petitioner raises substantially the same legal argument as she did in the state courts with respect to the allegedly erroneous admission of testimony from Paget and Paglianti regarding Salierno's statements to them. Any additional, previously unnoted examples of such testimony regarding Salierno's statements in the petition do not vitiate a claim that is exhausted. In any event, as set forth below, the claim is denied on the merits. See 28 U.S.C. §2254(b)(2).

2.     Procedurally Defaulted Claim

In Point III of her appellate brief, petitioner contended that the trial court erred by allowing Paget and Zeltzer to testify regarding Salierno's bar statement, since such statement was not in furtherance of the conspiracy. (Brief of Pet-App at 14). The Appellate Division determined that the issue was preserved with respect to Zeltzer's testimony, but was not preserved with respect to Paget's testimony.

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state law ground, see Maples v. Thomas, 132 S. Ct. 912, 922, 181 L. Ed. 2d 807 (2012); Walker v. Martin,--U.S.--, 131 S. Ct. 1120, 1127, 179 L.Ed.2d 62 (2011), "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); see also Martinez v. Ryan, 132 S. Ct. 1309, 1316, 182 L. Ed. 2d 272 (2012), or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," i.e., that he is actually innocent of the crime for which he was convicted. Coleman, 501 U.S. at 749-750, 111 S.Ct. 2546.

17

Absent exceptional circumstances not present here, New York's "contemporaneous objection" rule, i.e., a determination that an issue is not preserved for appellate review pursuant to N.Y.C.P.L. § 470.05(2), is an adequate and independent state law ground barring federal review of that issue absent a showing of cause and prejudice, or a fundamental miscarriage of justice. See Whitley v. Ercole, 642 F.3d 278, 280, 292 (2d Cir. 2011), cert. denied, 132 S. Ct. 791, 181 L. Ed. 2d 489 (2011); Richardson v. Greene, 497 F.3d 212, 219-20 (2d Cir. 2007). Since petitioner has not demonstrated cause for the failure to raise her claim challenging the admission of Paget's testimony regarding Salierno's bar statement in state court and actual prejudice therefrom, or her actual innocence, the claim with respect to Paget's testimony of Salierno's bar statement is dismissed as procedurally defaulted.

B.    Merits

1.    Standard of Review

Pursuant to 28 U.S.C. §2254(d), an application for a writ of habeas corpus:

> "[S]hall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

The Supreme Court has stated that "[a]s amended by AEDPA, §2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Harrington v. Richter, 562 U.S.----, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring)). A state court's "unreasonable application" of law must have been more than "incorrect or erroneous;" it must have been "objectively unreasonable." Sellan, 261 F.3d at 315 (quotations and citation omitted); see also Sorto v. Herbert, 497 F.3d 163, 169 (2d Cir. 2007).

Claims that were not adjudicated on the merits in state court are not subjected to the deferential standard that applies under AEDPA. See Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009) (citing 28 U.S.C. §2254(d)). But where AEDPA's deferential standard of review does apply, the "state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence." Bierenbaum v. Graham, 607 F.3d 36, 48 (2d Cir. 2010), cert. denied, 131 S. Ct. 1693, 179 L. Ed. 2d 645 (2011) (citing 28 U.S.C. §2254(e)(1)). Under AEDPA's deferential standard of review, "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a petitioner made insufficient effort to pursue in state proceedings." Cullen v. Pinholster, --- U.S. ---, 131 S.Ct. 1388, 1402, 179 L.Ed.2d 557 (2011) (quoting Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000)).

2.    Right of Confrontation

Petitioner claims that the "right of confrontation guaranteed her by the Fifth, Sixth and Fourteenth Amendments was violated by the trial court's rulings permitting the receipt of certain testimonial evidence. Specifically, petitioner asserts that witnesses were permitted to testify as to prejudicial hearsay statements, which were improperly received in the guise of co-conspirator statements." (Pet. at 1-2). Petitioner contends, inter alia, that:

> "The constitutional gravamen of the[] [trial court's] erroneous rulings requires no great elaboration. The admission of Salierno's hearsay afforded the petitioner no opportunity to confront the declarant of those devastating words. This undermined the most sacrosanct of the constitutional protections afforded an accused...The ability to test evidence through cross-examination is 'so important that the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process.' Ohio v. Roberts, 448 U.S. 56, 63, 100 S.Ct. 2531 (1980), citing Mattox v. United States, 156 U.S. 237, 242-243, 15 S.Ct. 337 (1895). The rulings of the trial court undermined the integrity both of the fact-finding process and the fairness of the trial guaranteed to petitioner."

(Pet. at 41).

In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause of the Sixth Amendment to the United States Constitution prohibits the admission of out-of-court "testimonial" statements of witnesses absent from trial against a criminal defendant at trial, unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. Id., at 57-59, 124 S. Ct. 1354. "Various formulations of this core class of 'testimonial' statements exist: 'ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially...extrajudicial statements ...contained in formalized testimonial materials, such as affidavits, depositions, prior

testimony, or confessions... [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Id., at 51-52, 124 S. Ct. 1354 (internal citations omitted).

Following Crawford, the Supreme Court confined the scope of the Confrontation Clause to testimonial statements. See Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 2274 165 L.Ed.2d 224 (2006); Bierenbaum, 607 F.3d at 49. "Only [testimonial] statements...cause the declarant to be a 'witness' within the meaning of the Confrontation Clause...It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Davis, 547 at 821, 126 S.Ct. 2266. Testimonial hearsay is defined as statements of those "who bear testimony" against the defendant, i.e., by making a "solemn declaration of affirmation...for the purpose of establishing or proving some fact...[or] a formal statement to government officers... ." Id., at 823-4, 126 S.Ct. 2266 (quoting Crawford, 541 U.S. at 51, 124 S.Ct. 1354).

In United States v. Feliz, 467 F.3d 227 (2d Cir.2006), the Second Circuit held: "Davis made clear, 'that the right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements.'" Feliz, 467 F.3d at 231; see also Bierenbbaum, 607 F.3d at 49 ("Nontestimonial statements...do not implicate the Confrontation Clause"). "[T]he inquiry under the Confrontation Clause is whether the statement at issue is testimonial...If not, the Confrontation Clause poses no bar to the statement's admission." Feliz, 467 F.3d at 232.

Petitioner does not point to a single statement that would be deemed "testimonial" within the scope of the Confrontation Clause. "[M]ost of the hearsay exceptions cover [] statements that

by their nature [are] not testimonial—for example,...statements in furtherance of a conspiracy." Feliz, 467 F.3d at 233 (quoting Crawford, 541 U.S. at 56, 24 S.Ct. 1354); see also U.S. v. Shyne, 617 F.3d 103, 108 (2d Cir. 2010) ("[T]he Supreme Court has indicated that statements in furtherance of a conspiracy are non-testimonial for purposes of the Confrontation Clause, and are therefore not covered by its protections."); U.S. v. Stewart, 433 F.3d 273, 292 (2d Cir. 2006) ("[s]tatements in furtherance of a conspiracy [are] generally not testimonial and [are] exceptions to the hearsay rule that encounter no Confrontation Clause obstacle"). With respect to Zeltzer's testimony regarding Salierno's bar statement, "an 'off-hand, overheard remark' [is] not...testimonial under [the Confrontation Clause to] the Sixth Amendment... ." Feliz, 467 F.3d at 232 (quoting Crawford, 541 U.S. at 51, 124 S.Ct. 1354).

The statements petitioner claims to be at the heart of the Confrontation Clause violation were non-testimonial in nature and testified to at trial by witnesses who recounted statements that they heard either petitioner or Salierno, her co-conspirator, make, and whose testimony was subject to cross-examination. Thus, under Crawford, there was no violation of the Confrontation Clause. Indeed, petitioner's constitutional argument relies upon the Supreme Court case Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which was expressly abrogated by Crawford. Although petitioner also makes reference to the jury's requests for Paget's written statement to the police and all "hard" evidence from Paget and Paglianti, (Pet. at 33-34), she does not contend that the admission of such evidence violated the Confrontation Clause. In any event, since both Paget and Paglianti testified at the trial and were cross-examined as to their testimonial statements, the admission of those statements did not violate the Confrontation Clause pursuant to Crawford.

Since none of the hearsay statements challenged by petitioner were testimonial in nature, the Appellate Division's determination that petitioner's Confrontation Clause claim was without merit was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, petitioner's Confrontation Clause claim is denied.

### 3.    Evidentiary Claims

Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. §2254(a); Wilson v. Corcoran, — U.S. —, 131 S.Ct. 13, 16-17, 178 L.Ed.2d 276 (2010), and "does not lie for errors of state law." Swarthout v. Cooke, — U.S. —, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (quoting Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). Challenges to the admissibility of evidence are cognizable on federal habeas review only if the petitioner can establish that the decision to admit the evidence rendered the trial so fundamentally unfair as to deny him or her due process of law, see Freeman v. Kadien, 684 F.3d 30, 35 (2d Cir. 2012), i.e., that the evidence in question was "so extremely unfair that its admission violate[d] fundamental conceptions of justice." Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990); see also Vega v. Walsh, 669 F.3d 123, 126 (2d Cir. 2012) ("[S]tate trial court evidentiary rulings generally are not a basis for habeas relief...[unless] the evidence was...so extremely unfair that its admission violated fundamental conceptions of justice." (quotations, alterations and citations omitted)). In order to constitute a denial of due process, the prejudicial evidence erroneously admitted "must have been sufficiently material to provide the basis for conviction or to remove a reasonable

doubt that would have existed on the record without it." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998), abrogated on other grounds by Perry v. New Hampshire, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012) (internal quotations and citations omitted). In short, the erroneously admitted evidence, viewed "in light of the entire record before the jury," id., must have been "crucial, critical, highly significant." Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985). Thus, in determining whether the state court's alleged evidentiary errors deprived a petitioner of a fair trial, the Court must consider: (1) whether the evidentiary ruling was erroneous under state law, and (2) if so, whether that error amounted to the denial of the constitutional right to a fundamentally fair trial.

The trial court's rulings: (1) that a predicate conspiracy was established for purpose of the exception to the hearsay rule, (2) that certain statements were made in furtherance of the conspiracy, and (3) that certain statements were otherwise admissible under state evidentiary law, were proper under New York law. See People v. Caban, 5 N.Y.3d 143, 149-51, 800 N.Y.S.2d 70, 833 N.E.2d 213 (N.Y. 2005). In any event, the admission of such statements was "not so extremely unfair [as to have] violated fundamental conceptions of justice," Vega, 669 F.3d at 126 (2d Cir. 2012) (quotations, alterations and citations omitted), particularly since the other evidence of petitioner's guilt was overwhelming. Specifically, *inter alia*, Russo and Diodato testified that Diodato put Russo into contact with Salierno after she had informed him that petitioner was looking for someone to beat Paul up; Russo and Pollack testified that during the initial meeting between themselves, petitioner, Salierno and Armanini, the subject of beating up Paul was discussed; Fandrey's testimony regarding petitioner's statements to him corroborated the testimony of Russo and Pollack that the subject of beating up Paul was discussed during the

24

initial meeting; Pollack additionally testified that petitioner had discussed having access to money during the initial meeting; Paglianti testified that he personally heard petitioner say to Salierno that she wanted Paul killed instead of just beaten and discuss with him what he would receive in return and observed petitioner provide Salierno with a photograph of Paul and driving directions to places where Salierno could locate Paul; telephone records corroborate calls between petitioner and Salierno at or around the time of Algeri's murder; evidence established that Algeri looked similar in appearance to Paul, drove the same type of vehicle as Paul and parked in the same area of the gym as Paul; and Paget testified that he and Salierno observed Algeri reaching into his vehicle, which was parked in the area of the gym where Paul usually parked his vehicle, prior to the shooting and that Salierno had called out Paul's name prior to shooting Algeri. Accordingly, the Appellate Division's determinations that any error in the admission of Salierno's bar statement was harmless, and that petitioner's remaining contentions were without merit, were not contrary to, or an unreasonable application of clearly established federal law, nor were they based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, petitioner's claims challenging the trial court's evidentiary rulings are denied.

III.    Conclusion

For the reasons set forth above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. §2253 is denied and the petition is dismissed in its entirety. As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. §2253(c)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123

S.Ct. 1029, 154 L. Ed. 2d 931 (2003).  Petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit.  See 28 U.S.C. §2253.

The Clerk of the Court is directed to enter judgment in favor of respondent, to close this proceeding and to serve notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure.


SO ORDERED.

s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 15, 2012
Central Islip, New York